PEOPLE ex rel. MINCHEN v. MacLEAN et al., Police Commissioners.

(Superior Court of New York City, General Term. January 3, 1893.)

1. POLICEMEN—DISMISSAL—DOUBLE PUNISHMENT.
   Consolidation Act, § 272, empowers the board of police commissioners· to punish offending policemen by forfeiting and withholding pay for a specified time, suspension without pay, "or" dismissal from the force. *Held*, that a fine imposed by the police commissioners on relator, a policeman, by withholding three days' pay, for his neglect of duty in failing to arrest a drunken officer, would not prevent them from dismissing him from the force for being himself under the influence of liquor and unfit for duty at the time he failed to make the arrest, as the two acts are distinct offenses.

2. SAME—REVIEW OF POLICE COMMISSIONERS' DECISION. ·
   On certiorari to review the judicial acts of the police commissioners, their findings on conflicting evidence are as conclusive as the verdict of a jury; and their proceedings are to be reviewed with a view of sustaining, rather than reversing, their judgments, and their discipline should not be interfered with except in extreme cases.

Certiorari by Michael G. Minchen against Charles F. MacLean and others, composing the board of police commissioners of New York city, to review their action in dismissing relator from the force. Judgment of police board affirmed.

For former report, see 19 N. Y. Supp. 548.

Argued before FREEDMAN, McADAM, and GILDERSLEEVE, JJ. ·

L. J. Grant and A. S. Warner, for relator.

Wm. H. Clark and Wm. A. Sweetser, for police board.

McADAM, J. The writ was issued to obtain a review of the action of the police board in dismissing the relator from his position as patrolman on the charge of being so much under the influence of liquor as to be unfit for duty on August 29, 1890. The appeal book shows that the relator had performed duty until 6 o'clock on the morning of August 29th, and was entitled to be relieved from duty for the balance of the day. That, after leaving the station house, the relator, in company with Officer Cullen, went to Brown's baths, at Sixty-Fourth street and East river, and remained there over three hours. From thence they went to Second avenue and Sixty-Ninth street. At Second avenue the relator and Cullen observed a crowd at the liquor store on the northeast corner of Sixty-Ninth street. A young man came up to them, and said, "There is an officer in the liquor store on the corner, who is raising the deuce, and the bartender wants to get him out." The relator and Cullen went in the saloon, and found Officer O'Brien there. He had an organ belonging to an Italian, was grinding it, and, as one of ·the·witnesses said, "looked as if he was crazy." The Italian was endeavoring to get his organ from O'Brien, but the latter would not give it up. The bartender and Cullen finally succeeded in returning the organ to the Italian, gave him some money to pacify him, and he left the place. The evidence

not only establishes these facts, but proves that from half past 8 to 10 A. M. O'Brien practically dominated the saloon, as if he owned it; that he dragged the organ grinder in from the street, and took his organ from him.    The bartender gave this testimony:

"Question. The object of your sending this young man out for these officers was to get O'Brien out on account of his disorderly conduct? Answer. Yes. Q. What did you say to this man? A. I said, 'For God's sake, get this man out of the place.' Q. What had O'Brien done? A. He wanted everything for nothing. Q. What do you mean? Cigars? A. Cigars and drinks; everything; a bottle of wine. Q. Had he been drinking? A. He was loaded."

All three officers were in uniform, and not absolutely free from duty. Finally the sergeant came in, and, in the language of the witness, "grabbed O'Brien by the neck, and pulled him out." It is needless to say that such conduct on the part of officers sworn to protect the peace and property of our citizens was not only unbecoming, but disgraceful. O'Brien (who has since resigned from the force) should have been arrested at once by the relator and taken to his captain, and finally before a magistrate, that he might have received the punishment he deserved for his riotous conduct. The relator had no right to stand at the bar of the liquor store trying to reason with his drunken brother officer    He had a more serious duty to perform, and failed to do it, and was properly charged by the sergeant with "neglect of duty." It is made the duty of the police force "at all times of the day and night    *    *    *    to preserve the public peace,    *    *    *    and protect the rights of persons and of property,    *    *    *    to inspect all places having excise licenses, and to repress and restrain all    *    *    *    disorderly conduct therein." Consolidation Act 1882, § 282. It is a sacred trust, to be performed with care and fidelity. Peace officers are those upon whom the public rely for the protection of their lives and property, and for which they pay liberally. The uniform and insignia of office of such officials carry with them the authority of the law, and at once command obedience and respect. They are chosen exemplars of the people, and when they depart from the straight path of duty, and assume the role of law breakers, common decency requires that they first divest themselves of their uniforms, the symbol of representative character, that their official position may not be held up to the scorn and ridicule of the multitude, to the detriment of the many others who are deserving officers. The position is a responsible one, and as honorable as the official seeks to make it. It is nearer the people than other officials, and concerns them more; and if the incumbent sinks so low as to forget self-respect, he should never permit his misconduct to bring discredit upon a department which, as a whole, is renowned for its valor and accredited for its honor. The idea that a citizen is compelled to ask protection against the lawless acts of a sworn protector of the public peace, "loaded with rum," is almost too revolting to be credited. This officer, clothed in the dignity of his office, representing in theory "law and order," should have been an exemplar of all that was orderly and becoming. In point of fact, the very acts he was sworn to suppress at all hazards were the very things he was committing in the most unseemly manner, and in a tone calculated to excite attention and adverse criticism. He should have been arrested

then and there, and consigned to prison for his offenses. The relator neglected his duty when he failed to arrest him, and at the same time lost an opportunity of assisting in vindicating the integrity of the department of which he was a member, as the offense committed in the presence of the relator was more serious than an ordinary breach of the peace, because committed by an officer. For this infraction of discipline the relator was fined "three days' pay." No fault is found with this sentence, and the matter would never have been called to the attention of the court if the thing had concluded there. But the sergeant, after "pulling" O'Brien out of the liquor store, took the relator and his companion, Cullen, before the captain, who discovered that the relator was at that time (10:45 A. M.) "under the influence of liquor, and unfit for duty." Though nominally off duty that day, the relator was liable to be called upon by his superior officers whenever the exigencies of the department required his services. He was in uniform, and subject to police discipline, which cannot be maintained if its officers are to be allowed upon the public streets and in public places in a state of inebriety. The captain made a formal charge against the relator upon the ground stated. It was satisfactorily proved before the police board, and the relator was, upon this charge, dismissed from the force. It is now urged that, because the relator was fined "three days' pay" on the charge of "neglect of duty," made by the sergeant, he could not be dismissed from the force, upon the charge made by the captain that he "was under the influence of liquor, and unfit for duty," as both offenses occurred on the same day. The proposition is based on section 272 of the consolidation act, which provides that "the board of police shall have power, in its discretion, on conviction of a member of the force, * * * to punish the offending party by reprimand, forfeiting and withholding pay for a specified time, suspension, without pay during such suspension, or dismissal from the force." The point is that, though the board can inflict any one of the several modes of punishment, it cannot inflict more; and that, having first punished the relator by withholding his pay, the board could not later punish him by dismissal. The point would have been well taken if the acts complained of had constituted a single offense, for the second judgment would have been void, because in excess of the power conferred. Ex parte Lange, 18 Wall. 163. But the two charges made against the relator (though tried at one and the same time, at his request) were entirely independent one of the other. They were the subject of separate trials and punishments, and the fine imposed on the charge for "neglect of duty," first made and decided, (October 3, 1890,) constituted no bar to the second charge, "for being under the influence of liquor, and unfit for duty," which was decided November 14, 1890. A fair test of this is that the first charge was complete in itself without reference to the second, and the latter was likewise complete without reference to the first. But, even if the question were a close one, we would be inclined to place that construction upon it which properly sustains the enforcement of that discipline so essential to the efficiency of our military and police forces. The commissioners had the witnesses before them, an opportunity of observing their

manner of testifying, passing upon their credibility, and determining from appearances and inherent probabilities the true value of the evidence offered before them. The means afforded by a viva voce examination of judging of the credit due to witnesses, especially where their statements conflict, are of incalculable advantage in the investigation of truth. They not infrequently supply the only test by which the real character of the witnesses can be appreciated. Starkie, Ev. (9th Ed.) 728. The finding made by the board is satisfactorily sustained by the proofs, and, like the verdict of a jury made on conflicting evidence, ought to be accepted as equally conclusive as to the facts. Indeed, the rule is that the commissioners are the statutory judges, and when they find upon the fact the judgment is generally accepted as conclusive. People v. Board of Fire Com'rs, 82 N. Y. 358; People v. Board of Fire Com'rs, 100 N. Y. 82, 2 N. E. Rep. 613; People v. French, 110 N. Y. 494, 18 N. E. Rep. 133; Id., 119 N. Y. 502, 23 N. E. Rep. 1061. The proceedings of the commissioners while acting judicially are to be reviewed with liberality, with a view of sustaining, rather than reversing, their judgments. This is necessary, for the reason that the commissioners are to a large extent responsible for the efficiency of the force under their control, and their methods of discipline should be interfered with only in extreme cases, where the charges have been unsupported by evidence, or the action of the board clearly arbitrary, and not in accordance with legal requirements. The board weighed the evidence presented, and made its findings on the facts, and upon these the extent of punishment rested, in its discretion, under the law we have cited. The board decided that the dismissal of the relator from the force was proper disciplinary punishment,—a conclusion difficult to resist, particularly in view of the previous record of the officer. For these reasons the judgment of the police board must be affirmed, with costs. All concur.